**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 14-532 |
| | : | |
| v. | : | |
| | : | |
| SWARTHMORE COLLEGE, | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |
| | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2014,

upon consideration of Defendant Swarthmore College's Motion to Dismiss All Counts of

Plaintiff's Complaint and Plaintiff's Response thereto, it is hereby ORDERED that Defendant's

Motion is DENIED.


BY THE COURT:


_____
Stewart Dalzell, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|                           |   |                          |
|---------------------------|---|--------------------------|
| JOHN DOE,                 | : |                          |
|                           | : |                          |
| Plaintiff,                | : | CIVIL ACTION NO. 14-532  |
|                           | : |                          |
| v.                        | : |                          |
|                           | : |                          |
| SWARTHMORE COLLEGE,       | : | **JURY TRIAL DEMANDED**  |
|                           | : |                          |
| Defendant.                | : |                          |
|                           | : |                          |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
SWARTHMORE COLLEGE'S MOTION TO DISMISS THE COMPLAINT**

Patricia M. Hamill, Esquire
Jeannette M. Brian, Esquire
Conrad O'Brien PC
1500 Market Street, Centre Square
Suite 3900, West Tower
Philadelphia, PA  19102-2100
(215) 864-9600

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................... 1

II.   OVERVIEW OF THE ALLEGATIONS IN THE COMPLAINT ...................... 4

III.   ARGUMENT ....................................................................................................... 7

A.   **Swarthmore Impermissibly Disputes The Complaint's Well-Pleaded Factual Allegations** ........................................................................................... 7

B.   **John Sufficiently Alleges Title IX Violations** ............................................. 8

    1.   Swarthmore Violated Title IX By Reaching An Erroneous Outcome On The Basis Of Sex. ........................................................... 9

    2.   Swarthmore Violated Title IX As A Result Of Its Deliberate Indifference To The Flawed Disciplinary Proceedings. ....................................... 14

    3.   Swarthmore Violated Title IX By Its Selective Enforcement Of Its Policies And Procedures Based On Gender. ............................... 16

    4.   Swarthmore Violated Title IX's Mandate That Disciplinary Hearings Accord Both Parties A Fair And Equitable Process. ....................... 17

  C.   **John Sufficiently Alleges Swarthmore Breached Its Contractual Obligations** ........... 23

    1.   Standards Governing Breach Of Contract Claims. ......................... 23

    2.   Swarthmore's Breaches. ............................................................... 26

        (a)   Swarthmore Breached Its Contractual Obligation To Conclude Its Investigation Within The Mandated 60-Day Period ........................ 26

        (b)   Swarthmore Breached Its Contractual Obligation To Conduct The Hearing When Classes Are In Session And Not During College Breaks. ............. 29

        (c)   Swarthmore Breached Its Contractual Obligation To Disclose The Evidence To Be Used Against John At The Hearing. .......................... 29

        (d)   Swarthmore Breached Its Contractual Obligation By Permitting An Undisclosed Witness To Testify At The Hearing. ................................. 30

        (e)   Swarthmore Breached Its Contractual Obligation To Provide John With Adequate Advice From An Impartial Observer. .......................... 32

        (f)   Swarthmore Breached Its Contractual Obligation To Timely Notify John Of The Actual Charges Against Him. .......................................... 33

        (g)   Swarthmore Breached Its Contractual Obligation to Ensure That Jane Doe Was Present At The Hearing ............................................... 35

        (h)   Swarthmore Breached Its Contractual Obligation To Ensure That The Panel Did Not Consider Evidence Of John's Past Sex History ...................... 36

i

**D.   John Sufficiently Alleges A Claim For Negligent Infliction Of Emotional Distress** ..... 36

**E.   Swarthmore Has Conceded A Binding Contract Between The Parties Exists, And Thus, The Alternative Claims For Negligence And Promissory Estoppel Are Moot**........................................................................................ 39

**IV.   CONCLUSION**..................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Ashcroft v. Iqbal,
  556 U.S. 662 (2009) .......................................................................................................7

B.F. Goodrich Co. v. Wilson,
  337 Pa. 333, 10 A.2d 422 (1940) ...........................................................................25, 31, 34

Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007) .......................................................................................................7

Bleiler v. College of the Holy Cross,
  2013 WL 4714340 (D. Mass. Aug. 26, 2013) .......................................................21

Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.,
  392 Pa. Super. 502, 573 A.2d 575 (1990) ................................................................24

Carrington v. Duke Univ.,
  No. 1:08-cv-00119, Memorandum Op. (M.D.N.C. Mar. 31, 2011) ........................................39

CoreStates Bank, N.A. v. Cutillo,
  723 A.2d 1053 (Pa. Super. 1999) ...........................................................................24

Dempsey v. Bucknell Univ.,
  2012 WL 1569826 (M.D. Pa. May 3, 2012) ...........................................................23

Doe v. Univ. of the South,
  687 F. Supp. 2d 744 (E.D. Tenn. 2009) ................................................................16, 18, 21

Fellheimer v. Middlebury College,
  869 F. Supp. 238 (D. Vt. 1994) .............................................................................23

Gebser v. Lago Vista Indep. Sch. Dist.,
  524 U.S. 274 (1998) .......................................................................................................18

Int'l Diamond Imp. Ltd. v. Singularity Clark, LP,
  40 A.3d 1261 (Pa. Super. 2012) .............................................................................24, 25

Int'l Systems, Inc. v. Personnel Data Systems, Inc.,
  274 Pa. Super. 500, 418 A.2d 518 (1980) ...............................................................25

Johnson v. Temple Univ.,
  2013 U.S. Dist. LEXIS 134640, 2013 WL 5298484
  (E.D. Pa. Sept. 19, 2013) .....................................................................................19, 21

Lane v. Com.,
    954 A.2d 615 (Pa. Super. 2008) ........................................................................26

Mallory v. Ohio Univ.,
    76 Fed. Appx. 634 (6th Cir. 2003) ..........................................................9, 14, 21

Murphy v. Duquense Univ. of the Holy Ghost,
    565 Pa. 57, 777 A.2d 418 (2001) ....................................................................24

Nami v. Fauver,
    82 F.3d 63 (3d Cir. 1996) ..................................................................................7

Oshiver v. Levin, Fishbein, Sedran & Berman,
    38 F.3d 1380 (3d Cir. 1994) ..........................................................................3, 7

Osteen v. Henley,
    13 F.3d 221 (7th Cir. 1993) ............................................................................19

Profit Wize Marketing v. Wiest,
    812 A.2d 1270 (Pa. Super. 2002) ....................................................20, 25, 26, 32

Reardon v. Allegheny College,
    926 A.2d 477 (Pa. Super. 2007) ......................................................................24

Schulman v. Franklin & Marshall College,
    371 Pa. Super. 345, 538 A.2d 49 (1988) ........................................................26

Southwestern Energy Production Co. v. Forest Resources, LLC,
    83 A.3d 177 (Pa. Super. 2013) ..................................................................25, 31

Stamerro v. Stamerro,
    889 A.2d 1251 (Pa. Super. 2005) ......................................................25, 26, 31, 33

Swartley v. Hoffner,
    734 A.2d 915 (Pa. Super. 1999) ......................................................................24

Tafuto v. N.J. Inst. of Technology,
    2011 WL 3163240 (D.N.J. July 26, 2011) ......................................................16

Toney v. Chester Cnty. Hosp.,
    961 A.2d 192 (Pa. Super. 2008),
    aff'd by equally divided court, 614 Pa. 98, 36 A.3d (2011) ..........................37, 38

Ware v. Rodale Press, Inc.,
    322 F.3d 218 (3d Cir. 2003) ............................................................................24

Weiley v. Albert Einstein Med. Center,
    51 A.3d 202 (Pa. Super. 2012) ..................................................................37, 38, 39

Wells v. Xavier Univ.,
    2014 WL 972172 (S.D. Ohio Mar. 12, 2014)..............................................................13, 16, 23

Williams v. Franklin & Marshall College,
    2000 WL 62316 (E.D. Pa. Jan. 13, 2000) ..........................................................................13, 23

Yusuf v. Vassar College,
    35 F.3d 709 (2nd Cir. 1994)..................................................................................9, 10, 13, 16

**STATUTES**

20 U.S.C. § 1681(a) (1988)..................................................................................................8

# I.  PRELIMINARY STATEMENT

This case arises out of extreme actions taken by Defendant Swarthmore College ("Swarthmore" or "College") in response to false allegations of sexual misconduct by a female student against a male student.  Jane Doe's accusation against John Doe ("John") came 19 months after the alleged incident, and was unsupported by any physical or medical evidence or police or campus public safety reports.[1]  After conducting its self-prescribed two-month investigation into Jane's complaint, Swarthmore closed the case without charging John with any misconduct.

Five months later, facing a media firestorm and a federal investigation for its insensitivity to female complaints of sexual assault, Swarthmore re-opened the investigation (in violation of its own written procedures), charged John with sexual assault and sexual harassment, rushed into a disciplinary hearing during summer break on an empty campus, and, based on nothing more than "she said, he said" testimony, found John guilty of the charges using a "preponderance of the evidence" standard.  The College punished John with its most severe penalty – immediate expulsion, carrying with it a permanent mark on his academic record stating he had been expelled for committing a sexual assault.

John has more than sufficiently met his burden to state a claim under Title IX.  He alleges particularized facts showing that (1) the outcome of his disciplinary proceeding was erroneous, (2) the College was deliberately indifferent to the serious procedural irregularities that had occurred in his case, (3) the College selectively enforced its policies and procedures, and (4) the College denied him rudimentary due process safeguards and conducted a hearing that manifestly was not fair and equitable to both parties.  John also has alleged particular facts suggesting that

---

[1]     Pseudonyms are used in the complaint to protect the identity and privacy of John and John's accuser.

gender was a motivating factor in the College's conduct:  in its zeal to show the Department of

Education and its critics that the College was determined to correct one wrong – its past

unresponsiveness to female complainants – it committed another wrong against John based on

his gender.  He was a male accused of sexual misconduct at the wrong time and in the wrong

place.

John has more than sufficiently met his burden to state a breach of contract claim.  He

identifies specific provisions in the College's Student Handbook governing Swarthmore's

obligations to students in sexual misconduct proceedings, and alleges specific facts showing that

Swarthmore failed to comply with those provisions in John's case, causing him to suffer severe

harm.[2]  The facts alleged in the complaint also sufficiently state a claim for negligent infliction

of emotional distress.

In its motion to dismiss, Swarthmore flouts the bedrock principle that it ***must accept***

***as true the factual allegations in the complaint,*** and ***must solely argue that, even accepting the***

***allegations as true, the complaint fails to state a claim***.  Instead, Swarthmore violates the Rules

of Civil Procedure by attaching documents to its memorandum of law in an attempt to present

so-called "evidence" to discredit John.  But, even if Swarthmore were permitted to present such

"evidence" at this stage of the case (and it absolutely is not), the documents Swarthmore has

cherry-picked do not prove what Swarthmore contends.

In particular, Swarthmore's reliance on John Doe's distressed email exchange with Jane

Doe's jealous boyfriend is completely misplaced.  (Def.'s Mem. at 4-5, n.1, & Exhibit A

---

[2]    Swarthmore concedes (as it must) that the Student Handbook and College Bulletin are contracts
(see Def.'s Mem. at 13-14, citing Pennsylvania appellate court cases holding that a college's published
policies and procedures constitute an "agreement between the parties"), and thus, it would appear there is
no need for John to defend his claims for negligence and promissory estoppel at this time, as those claims
were alleged in the alternative to his contract claim in the event that Swarthmore were to argue or this
Court were to find that no valid contract exists.

attached thereto). Swarthmore focuses on the boyfriend's accusation in one sentence of the two-page email that John's behavior toward Jane was "tantamount to rape." (Ex. A at 1). Swarthmore ignores the boyfriend's later statement that Jane "has a soft streak, and felt pity for you" (Ex. A at 2) – which contradicts his earlier accusation – and disregards the rest of the email, which focuses on the boyfriend's plan to cause John "pain" by telling John's girlfriend "all about your little affairs" unless John tells her first. (Ex. A at 2). In particular, the boyfriend states that (1) he owns a gun, (2) John is "lucky" that Jane "has dissuaded me from killing you outright, something which I very seriously considered," and (3) John should call his girlfriend to explain "your infidelities" or he (the boyfriend) will "send her a message tomorrow morning" about "your little affairs." (Id. at 2). The boyfriend names the girlfriend eight times in the email (id. at 1-2), and the subject line states: "You should call [your girlfriend] tonight." (Id. at 1). In his two-sentence response, John wrote, "I read your message, and I agree with it. I also called [my girlfriend] last night (around 2:00 AM, my time) letting her know what happened." (Id.).

Swarthmore insinuates that John's "I agree" response shows he admitted he had sexually assaulted Jane. That is neither plausible nor true (to use a phrase from Swarthmore's memorandum).[3] Swarthmore knows that John explained to the Title IX Coordinator that "I agree" meant "I agree that I should be the one to call my girlfriend and tell her about the infidelity," and in fact, "I already did." As John alleges in the complaint, he asked Jane to explain why the boyfriend had suggested in his email that John had taken advantage of her; she told John she did not know why, but that her boyfriend was irrational after Jane informed him of her sexual infidelity with John. (Compl. ¶¶ 68-72). Moreover, the email exchange shows that

_____

[3] Of course, whether a factual allegation is "true" is not an appropriate inquiry on a motion to dismiss. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994) (on motion to dismiss, court "must accept all facts pleaded as true and draw all reasonable inferences in favor of the plaintiff").

Jane's boyfriend was enraged and had considered taking out his rage on John. In this context, John's "admission" was made hurriedly, to avoid further confrontation, and to head off the boyfriend from contacting John's girlfriend.

The fact that the College seeks to cast John in a bad light by relying on a statement he made to an individual who boasted that he owns a gun and had seriously thought about using it is disturbing. The College is also disingenuous when it claims this document is "integral" to the complaint. (Def.'s Mem. at 4, 5 n.1). In fact, the College never once mentions it in its legal argument.

## II. OVERVIEW OF THE ALLEGATIONS IN THE COMPLAINT

In April 2011, John Doe and Jane Doe ("Jane"), a fellow Swarthmore student, engaged in two consensual physical encounters: (1) a brief kiss on April 23, 2011; and (2) sexual activities on April 30, 2011. The two did not have sexual intercourse during either encounter. On May 1, 2011, one day after the second encounter, by Jane's own admission, she came to John's dorm room and initiated sexual intercourse. (Compl. ¶¶ 2, 62-74). *Nineteen months* later, Jane reported the first and second encounters to Swarthmore, claiming she had been coerced. Her only evidence consisted of her own inconsistent, equivocal accounts of what had transpired. She offered no physical or medical evidence and no police or campus public safety reports. (Id. ¶¶ 78-80).

Soon after Jane made these accusations, Swarthmore conducted a two-month investigation and concluded the matter without issuing charges or taking any disciplinary action against John. (Id. ¶¶ 3, 83, 95). Since February 2013, the month after Swarthmore concluded its investigation, Swarthmore and its administration have been castigated in the media for allegedly mishandling past sexual misconduct complaints brought by female students against male

students.  (Id. ¶¶ 4, 96).  In April 2013, two female students filed complaints with the U.S.

Department of Education ("DOE" or "Department of Education") against Swarthmore under

Title IX and the Clery Act, alleging, among other things, that the College discourages female

students from filing sexual misconduct complaints, underreports incidents of sexual misconduct

by male students against female students, and fails to appropriately discipline male sexual

offenders.  The complaints generated widespread media coverage and reports criticizing

Swarthmore's administration and staff.  (Id. ¶¶ 5, 97, 99).

In response to the federal complaints and public criticism, Swarthmore President Rebecca

Chopp announced to the press that Swarthmore has "zero tolerance" for any form of sexual

assault or abuse.  (Id. ¶ 6).  Less than two weeks following the filing of the Title IX complaint,

Swarthmore suddenly re-opened the investigation of Jane's accusation against John, issued

formal charges against him for sexual assault and sexual harassment, and fast-tracked a College

Judiciary Committee ("CJC") hearing.  (Id. ¶¶ 7, 98).  The CJC Panel decided that John "more

likely than not" had violated the College's sexual misconduct policy.  Swarthmore immediately

expelled him, three months before his senior year would have begun – and more than two years

after the alleged incident took place.  (Id. ¶ 8).  On information and belief, John's case was the

first case of alleged sexual misconduct heard after the federal complaints were filed.  (Id. ¶ 9).

John appealed his expulsion to President Chopp, citing among other things the College's

failure to follow its policies and procedures for disciplinary proceedings, which resulted in a

fundamentally unfair hearing.  (Id. ¶ 10).  On July 12, 2013, the DOE's Office of Civil Rights

("OCR") announced that it would investigate Swarthmore concerning the allegations set forth in

the federal complaints.  Four days later, President Chopp denied John's appeal.  (Id. ¶¶ 11, 12).

In its rush to judgment against John in its re-opened investigation and adjudication, the College failed to follow its own policies and procedural safeguards by:

(a) Failing to conclude its investigation within the mandated 60-day period;

(b) Scheduling the hearing when classes were not in session;

(c) Failing to disclose evidence to be used against John at the hearing;

(d) Permitting an undisclosed witness to testify on Jane's behalf at the hearing;

(e) Failing to provide John with adequate advice from an impartial Observer;

(f) Failing to timely notify John of the actual charges against him;

(g) Failing to ensure that Jane Doe was present at the hearing, by suggesting that she leave the hearing during a critical part of John's testimony about what occurred during the encounters at issue;

(h) Failing to ensure that the Panel did not consider evidence of John's past sexual history. (Id. ¶ 13).

John further alleges that Swarthmore's handling of the disciplinary proceeding against him and the Panel's finding of guilt violated Title IX because (among other reasons) John is innocent of the charges, the College improperly meted out the most extreme punishment – expulsion – on the thinnest of evidence, and gender was a motivating factor behind the College's actions. (Id. ¶¶ 14, 157-161).

In addition, John alleges that Swarthmore's sexual misconduct policies violated his entitlement under Title IX to basic due process safeguards to ensure a disciplinary proceeding that is fair and equitable to both parties. Under Swarthmore's policies, students accused of serious sexual misconduct are prohibited from obtaining the advice of counsel at any time during the disciplinary proceedings; they are not permitted to question their accusers during the hearing;

6

and they are subject to a "preponderance of the evidence standard" despite the fact that they face felony-type charges with the most serious potential penalties.  (Id. ¶¶ 15, 143-145).

As a result of Swarthmore's conduct, John sustained severe damages, as his academic future, career prospects, earning potential, and reputation have been injured, if not entirely destroyed.  The money, time and effort John spent obtaining a college education at Swarthmore and fostering relationships with the Swarthmore community are lost.  The adverse mark on his record resulting from false accusations made 19 months after the alleged misconduct took place jeopardizes, if not shatters, his goal of attending law school and pursuing a joint graduate degree. (Id. ¶ 16).

## III.    ARGUMENT

### A.    Swarthmore Impermissibly Disputes The Complaint's Well-Pleaded Factual Allegations.

When evaluating a motion to dismiss for failure to state a claim under Fed. R. Civ. Pro. 12(b)(6), the district court "must accept all facts pleaded as true and draw all reasonable inferences in favor of the plaintiff."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  When considering a Rule 12(b)(6) motion, the court does not "inquire whether the plaintiff[ ] will ultimately prevail, only whether [he is] entitled to offer evidence to support [his] claims."  Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996).

Swarthmore fails to adhere to the fundamental procedural rule requiring it to accept as true the well-pleaded factual allegations in the complaint.  Instead, in the fact section of its memorandum, Swarthmore improperly attempts to present "evidence" by attaching and relying

on documents that are extraneous to the complaint and by referring to purported "facts" that are not alleged in the complaint. As noted in the Preliminary Statement, Swarthmore relies on one such document – an email exchange between John Doe and Jane Doe's boyfriend – to suggest that John admitted to having committed sexual assault. For the reasons stated, the email does no such thing, and Swarthmore's reliance on the document before discovery has taken place to try to create a one-sided record is manifestly unfair. In the same vein, Swarthmore disputes John's allegations concerning his first and second encounter with Jane, and recounts purported facts with respect to a fourth encounter, based on a statement made by Jane Doe on May 14, 2013 in a document outside of the complaint. (Def.'s Mem. at 5 & n.2). Neither of these documents is "integral" to the claims in the complaint, as evidenced by the fact that Swarthmore **never** refers to them in its legal arguments. Rather, in its legal arguments, Swarthmore relies solely on the Student Handbook and College Bulletin attached to the complaint, with references to some additional documents related to the procedures leading up to John's hearing and his later appeal. Accordingly, the email and references to the May 14, 2013 statement should be disregarded by the Court. Swarthmore also argues that it did not re-open the investigation, and that John's allegations concerning Swarthmore's gender-motivated conduct are "neither plausible nor true." (Def.'s Mem. at 2). These contentions are inappropriate argument with the facts on a motion to dismiss.

### B. John Sufficiently Alleges Title IX Violations.

Title IX provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a) (1988).

Title IX is enforceable through a private right of action for monetary damages as well as equitable relief. Yusuf v. Vassar College, 35 F.3d 709, 714 (2nd Cir. 1994) (citations omitted). It "bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." Id. at 715. Although the Third Circuit has not analyzed Title IX in the context of student-college disciplinary proceedings, the Second and Sixth Circuits have found that students – male and female – subject to disciplinary proceedings can state Title IX claims under four possible standards: the "erroneous outcome," "selective enforcement," "deliberate indifference," and "archaic assumptions" standards. Yusuf, 35 F.3d at 715 (analyzing Title IX claims under "erroneous outcome" and "selective enforcement" standards); Mallory v. Ohio Univ., 76 Fed. Appx. 634, 638 (6th Cir. 2003) (noting Title IX claims may also be brought under "deliberate indifference" and "archaic assumptions" standards). John sufficiently alleges Title IX violations pursuant to the erroneous outcome, deliberate indifference, and selective enforcement standards.

### 1. Swarthmore Violated Title IX By Reaching An Erroneous Outcome On The Basis Of Sex.

In an "erroneous outcome" claim, the plaintiff alleges that he or she "was innocent and wrongly found to have committed an offense." Yusuf, 35 F.3d at 715. Plaintiffs who claim an erroneous outcome was reached "must allege particular facts sufficient to cast *some articulable doubt on the accuracy of the outcome* of the disciplinary proceeding." Id. (Emphasis added). *"[T]he pleading burden in this regard is not heavy*." Id. (Emphasis added). A complaint meets the pleading requirement when, for example, it alleges "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of the complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." Id. A complaint "may also allege particular procedural flaws affecting the proof." Id. In addition to allegations of an erroneous outcome, a plaintiff must allege "particular circumstances suggesting

that gender bias was a motivating factor behind the erroneous finding" and/or that the "punishment" imposed on the plaintiff was a result of gender bias. Id. at 715-16.

Here, the complaint sets forth particularized facts that are more than sufficient "to cast some articulable doubt" on the accuracy of the outcome, and that strongly suggest "gender was a motivating factor behind the erroneous finding."

With respect to the "erroneous outcome" prong of his claim, John alleges facts showing that the CJC Panel found him guilty of the charges against him absent any credible evidence of wrongdoing. The Panel disregarded every fact and circumstance that called into serious question the veracity of the accusation. (Compl. ¶ 174). In particular, the Panel should have been concerned by the fact that (1) Jane did not report the alleged incident until 19 months had passed, (2) Jane admitted she instigated consensual sexual intercourse with John one day after the alleged assault, and (3) her accounts of what had happened kept changing in a series of interviews and written statements submitted to the Title IX Coordinator in the first and re-opened investigations. (Id. ¶¶ 2, 111-117, 174). For example, in an interview in the first investigation, she stated that John "asked" to perform oral sex on her, that she denied his request, and that she "tried" to perform oral sex on him "instead." (Id. ¶ 115). Yet, in a written statement filed in the re-opened investigation, she alleged that John "attempted" rather than "asked" to perform oral sex on her, and subsequently "forced" her to perform oral sex on him. (Id. ¶ 116). In the first investigation, she admitted going to John's dorm room one day after the alleged assault, whereupon she instigated consensual intercourse. (Id. ¶¶ 2, 117). Jane's story changed in the re-opened investigation. This time she admitted to going to John's dorm room and instigating sexual intercourse, but added that she did so to prevent John from hurting her. (Id. ¶ 117).

The Panel also ignored evidence suggesting that Jane's troubled relationship with her

jealous, volatile boyfriend/fiancé may have given her an incentive to fabricate the assault. (Id. ¶¶ 63, 65-73, 148). The Panel discounted or ignored the fact that the evidence of the alleged assault consisted only of "she said, he said" testimony; Jane provided no medical or physical evidence that she had been assaulted; and Jane never reported the incident to the police or campus public safety department. (Id. ¶¶ 2, 174).

In addition to these deficiencies in the proof at the hearing, the Panel allowed Jane to present evidence that should have been excluded and disregarded procedural rules so as to favor Jane. The Panel permitted Jane to testify about a written statement she had prepared before the hearing to rebut John's version of events, but that had not been included in the evidence file. (Compl. ¶¶ 13g., 133). Admission of that testimony violated the College's mandatory obligation to disclose to John in advance of the hearing the evidence that will be presented so that he could prepare his case. (Id. ¶¶ 39, 47).[4]

The Panel compounded that procedural error when it allowed an undisclosed witness, the College's Title IX Coordinator, to read a portion of Jane's statement into evidence in order to corroborate Jane's statement. (Id. ¶¶ 134, 174). Ms. LaMar's testimony violated Swarthmore's procedures requiring the parties to disclose their witnesses in advance of the hearing. (Id. ¶ 46 ("the accused student and the complainant *must submit to the Observer a list of witnesses they plan to call at the hearing* . . . .") (Emphasis added)). Swarthmore counters that the Panel called Ms. LaMar as a witness, and the Panel is entitled to call its own (undisclosed) witnesses. (Def.'s Mem. at 22). However, the College expressly represented to John before the hearing that Ms. LaMar would not be present; thus, her appearance as a surprise witness violated the College's

---

[4]    See Exhibit A to the Complaint at 37-38: the accused "*shall* be shown a copy of the materials that will be present in the hearing in sufficient time before the hearing . . . to prepare [his] case [ ]; a "*file containing relevant evidence for the case will be available in the Dean's Office for review by the parties*") (Emphasis added).

obligation to be fair and even-handed, and to provide John with accurate and truthful information about the judicial process. (Compl. ¶¶ 135-137).

The Panel also violated Swarthmore's policy that the "accuser and accused are present" during the hearing when the Panel, on its own, without a request from either Jane or John, suggested that Jane might want to leave the hearing in the middle of John's testimony, and permitted her to do so. (Compl. ¶¶ 45, 139-141) ("Normally, **all evidence** presented at a hearing by either party **shall be introduced in the presence of the other party"**) (Emphasis added)). The clear inference to be drawn from the Panel's extraordinary conduct in suggesting and allowing John's accuser to leave the proceedings during John's testimony is that the Panel wished to spare Jane from hearing John's side of the story, and had pre-determined that Jane was the victim and John was the victimizer. (Id. ¶ 142).

With respect to the gender-bias prong of his claim, John alleges that starting in February 2013, Swarthmore was subject to growing negative publicity for its perceived mishandling of sexual misconduct complaints brought by female students against male students. Shortly after two female Swarthmore students filed Title IX and Clery Act complaints with the Department of Education alleging, among other things, that the College fails to appropriately discipline male sexual offenders, the President of Swarthmore announced a new "zero tolerance" policy for any form of sexual assault or abuse. (Compl. ¶¶ 4-7, 96-99, 173).

In the midst of this criticism, the College suddenly re-opened its investigation of Jane's accusation of sexual assault against John. (Id.). The College promptly charged John with the most serious sexual misconduct charge – sexual assault – despite the fact that nearly two years had passed from the date of the alleged incident. Then, less than two days before the scheduled hearing, the College changed the charge of "harassment by communication" to "sexual

harassment," right at the time when one of the female complainants in the federal actions publicly criticized the College for having charged her alleged assailant with "communication" harassment instead of the more serious "sexual" harassment charge. (Id. ¶¶ 126-128). The College rushed into the hearing during summer break, at a time when the campus was empty, when none of John's peers would have been available to testify on his behalf, and when it would be virtually impossible to locate student witnesses who might have been able to refute Jane's story that she was inebriated on the night of the alleged assault. (Id. ¶ 131).

When viewed collectively, the above-cited allegations are more than sufficient to state a claim that the outcome of the hearing was both erroneous and motivated by John's gender. In the wake of public criticism, the federal complaints, and the DOE investigation, the College rushed to judgment against John; found him guilty of serious sexual offenses two years after the alleged assault based on nothing more than "she said, he said" testimony; and meted out the most severe punishment in order to show the DOE and the College's detractors that the College's perceived past insensitivities to female complainants would no longer be tolerated as part of its new "zero tolerance" policy. Like the complaint found to be sufficient in Yusuf, the complaint here passes muster, and John should be permitted to proceed to discovery to prove his claims. See Yusuf, 35 F.3d at 716 (finding complaint alleging "erroneous outcome" of disciplinary hearing that found male student guilty of sexual harassment "sufficiently put into question the correctness of the outcome of that proceeding").[5]

---

[5]    See also Wells v. Xavier Univ., 2014 WL 972172, at *1, 5 (S.D. Ohio Mar. 12, 2014) (finding that plaintiff's "erroneous outcome" claim survives the university's challenge on motion to dismiss, where plaintiff alleges that the university and its president made the plaintiff "into a scapegoat so as to demonstrate a better response to sexual assault"); Williams v. Franklin & Marshall College, 2000 WL 62316, at *2 (E.D. Pa. Jan. 13, 2000) (denying college's motion to dismiss Title IX claim, where plaintiff had been expelled for an alleged "date rape" and plaintiff alleged the college had "foment[ed] a witch-hunt against male students on a totally unfounded belief that date-rape activities were rampant on campus, and that this crusade culminated in utterly false allegations of misconduct against plaintiff").

In light of the foregoing, there is no merit in Swarthmore's argument that the complaint contains "no particularized facts" suggesting that "gender bias had anything to do with the outcome" of the hearing. (Def.'s Mem. at 26-27). To the contrary, the complaint does just that.

Swarthmore argues that it could not have been motivated by gender bias because it is not "alleged to have publicized the results of the proceedings," and so it "had nothing to gain by supposedly making an example out of John Doe." (Def.'s Mem. at 27). As alleged in the complaint, however, Swarthmore *did* have something to gain – i.e., demonstrating to the DOE and the Office of Civil Rights that the College was serious about allegations of sexual assault brought by female students against male students and that it was immediately implementing its "zero tolerance" policy. (Compl. ¶¶ 4-6, 96-99, 151-153, 157-161, 172-173). Additionally, as the Student Handbook makes clear, the College sends a "public summary" of each case (excluding names of the parties and other specific identifying information) to the College's newspapers and posts the summary outside the Dean's Office, where it is on view for Swarthmore students, faculty, staff, and visitors. (Compl., Ex. A at 41). And so, in fact, the College *did* publicize the results of John's proceeding, albeit without identifying the parties. Members of Swarthmore's community who viewed the posting or newspaper summary would have known that a student had been expelled for sexual assault.

### 2. Swarthmore Violated Title IX As A Result Of Its Deliberate Indifference To The Flawed Disciplinary Proceedings.

In a "deliberate indifference" claim, a plaintiff must ultimately show "that an official of the institution who had authority to institute corrective measures had actual notice of and was deliberately indifferent to, the [university's] misconduct." Mallory, 76 Fed. Appx. at 638. Here, John alleges that he appealed the Panel's decision to Swarthmore's President, citing the College's violations of its own policies and procedures for disciplinary proceedings and the

Panel's failure to conduct a fair and equitable hearing. (Compl. ¶ 10). John also asked the President to consider the unusual facts of his case, including that Jane did not dispute she initiated consensual sexual intercourse one day following the alleged assault, and that Jane did not report the alleged assault until 19 months later while spending the year in Scotland with her boyfriend (who was by then her fiancé), whose trust she regretted having breached through her consensual encounter with John. (Id. ¶ 148).

Thereafter, the College furnished a copy of the appeal to Jane in order to give her an opportunity to respond – even though the Student Handbook's post-hearing procedures *only* permit the filing of the appeal itself and, if the President wishes, the filing by "***the Convenor and/or Observer***" of "***additional statements concerning the hearing and events connected to the hearing***." (Id. ¶ 149 & Ex. A at 40-41) (Emphasis added). The Handbook does not contain a provision allowing the non-appealing party to review, much less submit a response to, the appeal. (Id.). As invited by the College, Jane submitted a response, which presumably was considered by Swarthmore's President in her decision. On July 12, 2013, while the appeal was pending, the DOE's Office of Civil Rights announced that it had opened an official investigation into Swarthmore concerning the allegations set forth in the Title IX and Clery Act complaints. Four days after learning of the federal investigation, President Chopp denied John's appeal and upheld the Panel's findings and expulsion sanction. (Id. ¶¶ 151-153).

These allegations are sufficient to state a claim for "deliberate indifference." Upon receipt of John's appeal, the President of Swarthmore was on actual notice that serious procedural irregularities had occurred in John's case. The President had the authority to institute measures to correct the misconduct, in this case the alleged procedural violations and defective hearing, by granting John's request for a rehearing. The President's Office did nothing to take

corrective action with respect to John's case, and instead, solicited a "response" from Jane and denied the request four days following the DOE's announcement of the investigation of the federal complaints. As noted, those complaints alleged, among other things, that Swarthmore discourages female students from filing sexual misconduct complaints and fails to appropriately discipline sexual offenders. (Id. ¶ 5). These allegations state a "deliberate indifference" claim, and John should be permitted to prove his claim through discovery. See Wells, 2014 WL 972172, at *5 (denying motion to dismiss "deliberate indifference" claim, noting student alleged the president of Xavier allowed the defective hearing to stand "with the goal of demonstrating to the OCR that Xavier was taking assault allegations seriously").

### 3. Swarthmore Violated Title IX By Its Selective Enforcement Of Its Policies And Procedures Based On Gender.

In a "selective enforcement" claim, the plaintiff alleges that, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." Yusuf, 35 F.3d at 715. To state a "selective enforcement" claim, a male plaintiff must allege that "the [educational institution's] actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." Tafuto v. N.J. Inst. of Technology, 2011 WL 3163240, at *2 (D.N.J. July 26, 2011), quoting Doe v. Univ. of the South, 687 F. Supp. 2d 744, 757 (E.D. Tenn. 2009).

Here, John alleges that cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, and that Swarthmore has adopted and applied sexual misconduct policies and procedures that disproportionately adversely affect male students. (Compl. ¶ 14). Because female students at Swarthmore rarely (if ever) face charges of sexual misconduct, they are not disadvantaged by the College's sexual misconduct policies that

place onerous burdens on the accused students and deny them rudimentary due process safeguards. For example, the College permits the parties to review the evidence file just 48 hours before the disciplinary hearing, and does not permit the parties to make photocopies or remove the file from the Dean's office for further review after business hours. (Id. ¶¶ 39, 47). The accused (male) is disproportionately affected by this highly restricted access to the evidence that will be used against him, whereas the accuser (female) knows what her evidence will be.

Further, as more fully explained in the next section, it appears that Swarthmore does not permit the parties involved in sexual misconduct proceedings to obtain the advice of counsel at any time during the proceedings. (Id. ¶ 51). The accused (male) is disproportionately adversely affected by this policy, because the accused is the party who must defend against the charges and who faces potential serious penalties – including in John's case expulsion. Likewise, Swarthmore does not permit the complainant and the accused to question each other during the hearing. (Id. ¶ 52). This policy disproportionately adversely affects the accused (male) for the same reason – the accused is disadvantaged in presenting his defense by his inability to question his accuser and the accused is the party who faces potential serious penalties.

> **4. Swarthmore Violated Title IX's Mandate That Disciplinary Hearings Accord Both Parties A Fair And Equitable Process.**

Swarthmore argues that John's "due process" allegations fail as a matter of law because Title IX does not provide a "private right of action for alleging due process violations." (Def.'s Mem. at 24).[6] Swarthmore is incorrect. Swarthmore acknowledges (as it must) that the Department of Education's Title IX regulations require all higher educational institutions to have sexual assault policies and procedures that "***accord[ ] due process to both parties involved***."

---

[6]    Swarthmore also argues that Pennsylvania courts are not permitted to review a breach of contract claim against a private university according to due process principles arising out of the Fourteenth Amendment, which govern state action. (Def.'s Mem. at 24). John does not dispute that contention.

(Def.'s Mem. at 29, quoting 66 Fed. Reg. 5512 at 22) (Emphasis added). Two days after

denying John's appeal, Swarthmore's President publicly acknowledged that "***the U.S.***

***Department of Education clearly mandates a fair and equitable process for both complainants***

***and respondents***." (Compl. ¶¶ 154-155) (Emphasis added).[7]  In that same publicly-released

email, President Chopp stated that the College must "***adhere to due process***."  (Id. at 155 & link

to *Daily Gazette: The Slog.* http://daily.swarthmore.edu/slog/2013/07/president-chopp-releases-

sexual-assault-consultants-interim-report-announces-staffing-changes/ (newspaper article

reproducing in full President Chopp's email, at 4th para.) (Emphasis added)).

     While courts have held that students in private and public educational institutions are not

entitled to the full panoply of due process rights accorded to criminal defendants in courts of law

under the Fourteenth Amendment, it is clear that some measure of reasonable due process is

required in student disciplinary proceedings to ensure "a fair and equitable process" for both

parties.  John alleges that Swarthmore violated Title IX by failing to offer him three rudimentary

procedural safeguards, resulting in a fundamentally flawed disciplinary proceeding.

     First, despite the threat of serious charges and severe sanctions, Swarthmore's policies

and procedures appear to prohibit those accused of sexual misconduct from receiving assistance

---

[7]       In support of its argument that John does not have a private right of action for due process
violations under Title IX, Swarthmore relies on a district court case and a U.S. Supreme Court case,
neither of which supports that contention.  (Def.'s Mem. at 29).  In Doe v. Univ. of the South, 687 F.
Supp. 2d 744, 758 (E.D. Tenn. 2009), the district court merely stated the uncontroversial proposition that
Title IX litigants cannot recover damages based on the "University's alleged violation of the U.S.
Department of Education's guidelines."  ("[T]he University's alleged failure to comply with Title IX
regulations promulgated by the United States Department of Education does not confer a private right of
action.")  Rather, any such violations are enforced by the agency.  Id.  In Gebser v. Lago Vista Indep.
Sch. Dist., 524 U.S. 274 (1998), the Supreme Court articulated the same principle, i.e., there is no
"private right of action under Title IX [for] recovery in damages" for a school's violation of Department
of Education "regulations" and "administrative requirements."  524 U.S. at 291-92.  Instead, the agency
has the authority to enforce its requirements through administrative actions directed to the offending
institution.  Here, John does not allege a Title IX violation based on Swarthmore's failure to comply with
DOE regulations.  He alleges that Swarthmore violated Title IX by failing to offer him rudimentary due
process safeguards to ensure a "fair and equitable process," resulting in a procedurally flawed disciplinary
proceeding.

of legal counsel. The College imposes a code of strict confidentiality preventing the accused at any time before or during the disciplinary hearing to disclose information except to "consult with and/or obtain advice from his/her supporter; family or guardian; physician, therapist, or counselor . . . ." (Compl. ¶ 51). Any breach of confidentiality by a hearing participant "shall constitute a violation of College policy and is an adjudicable offense." (Compl., Ex. A at 37). The only "advisor" available to John with respect to his legal rights was Swarthmore's Associate Dean for Student Life, who was not a lawyer, and who, in addition to serving as "advisor" to John, was in charge of advising the accuser of her rights *and* determining whether and which charges should be brought – a clear conflict of interest. (Id. ¶¶ 15a., 129).

Swarthmore points to cases in which courts have observed that "[a]ccused students do not have the right to be actively represented by an attorney at a disciplinary hearing . . . in the usual way of trial counsel"; however, those cases go on to state that ***"[t]he general consensus . . . is that . . . the student has a right to get the advice of a lawyer*** . . . ." (Def.'s Mem. at 30, citing Johnson v. Temple Univ., 2013 U.S. Dist. LEXIS 134640, at *26; 2013 WL 5298484, at *10 (E.D. Pa. Sept. 19, 2013) (Emphasis added); Osteen v. Henley, 13 F.3d 221, 225 (7th Cir. 1993) (noting a student involved in a disciplinary proceeding has a right "to *consult* counsel") (Emphasis in original)). These cases support John's due process argument.

Although John was never told by Swarthmore that he had a right to obtain advice of counsel, Swarthmore now appears to argue that the Student Handbook permits parties involved in disciplinary hearings to consult with counsel. (See Def.'s Mem. at 30). Swarthmore may be pointing to language in the Student Handbook immediately following the "consult" language cited above, stating that the complainant and accused may disclose information in order to "prepare her/his claim(s) and/or defense(s) for presentation to the Committee." (See Compl., Ex.

A at 37).  This phrase is cryptic and opaque.  It does not say to whom information may be disclosed.  The words "attorney," "counsel," "legal advice," "advice of counsel," "the right to an attorney," or any other words or phrases signifying that the accused has the right to consult with an attorney do not appear here, or anywhere else in the Student Handbook.[8]

The language employed by Swarthmore is ambiguous because it is "obscure in meaning through indefiniteness of expression."  Profit Wize Marketing v. Wiest, 812 A.2d 1270, 1275 (Pa. Super. 2002).  It is hornbook law that ambiguous provisions are "to be construed against the drafter."  Id.  Here, there can be no dispute that Swarthmore is the drafter of the contract.

Furthermore, John's Swarthmore-supplied advisor, Associate Dean Westphal, reminded John in the two Charge Letters sent to him, attached as Exhibits D and E to Swarthmore's memorandum (if the Court considers these documents), that "all CJC proceedings are confidential and should not be shared with the general public, except your family, therapist … and/or support person for the hearing."  (See Def.'s Mem., Exs. D & E).  In light of Dean Westphal's statements, the Student Handbook's ambiguous language could mean that information can be disclosed to the "support person" attending the hearing, not to an attorney.  In addition, Swarthmore's policies permit only the complainant and the accused to review the evidence file 48 hours in advance of the hearing.  (Compl. ¶¶ 39, 47).  Thus, regardless of whether or not the Handbook permits consultation with an attorney, it does not permit the

---

[8]     The Student Handbook makes clear that the term "counselor" as used throughout the Handbook refers to health-related counselors, not legal counsel.  (See, e.g., Compl., Ex. A at 17 (referring to "Sexual Health Counselors"); 2, 6-7, 20 (describing psychological "counseling" services, "counseling sessions" with therapy "counselors," nutrition "counseling," and sexually-transmitted disease "counseling")).  The only reference to the word "attorney" in the Student Handbook appears in the section concerning school officials who are entitled to disclosure of educational records without prior written consent of the student.  That section defines school officials as including persons employed or under contract to the College to perform special tasks, "such as attorneys and auditors."  (See Compl., Ex. A at 3).

accused to share the evidence file with an attorney or allow for meaningful consultation.[9]

Swarthmore led John to believe he did not have permission to consult with an attorney regarding the charges against him – and in fact he did not do so. Lacking advice of counsel almost certainly affected the outcome of the hearing: John – a college student with no legal training – was forced to defend himself against felony-type charges in a rushed hearing, after having reviewed the written complaint against him and the evidence to be presented just 48 hours earlier – all without assistance from an attorney.

Second, Swarthmore's policies and procedures clearly prohibit students accused of sexual assault from questioning their accuser at the hearing, and in John's case the College placed a physical divider between him and Jane during the hearing. (Compl. ¶¶ 15b. & c.). These measures prevented John from confronting his accuser at the hearing through cross examination and even from observing her during her testimony. (Id. ¶ 143). Swarthmore points to case law stating that the "right to unlimited cross-examination" has not been deemed an essential requirement in school disciplinary cases (Def.'s Mem. at 30), but in at least two cases the schools permitted the accused to ask questions of his accuser. Bleiler v. College of the Holy Cross, 2013 WL 4714340, at *3 (D. Mass. Aug. 26, 2013) (both complainant and accused "were permitted to ask questions of . . . each other"); Mallory v. Ohio Univ., 76 Fed. Appx. at 637 (Mallory's student-representative was permitted to ask questions about the matters each witness discussed on direct). Swarthmore did not even accord that bare-minimum right to John.

---

[9]     In several cases cited by Swarthmore, both public and private universities accorded significantly greater rights to the accused than Swarthmore did to John. See, e.g., Johnson v. Temple Univ., 2013 U.S. Dist. LEXIS 134640, at *27; 2013 WL 5298484, at *10 (permitting accused students to retain any advisor they choose, including a lawyer, who may assist the students in preparing for the hearing and may attend the hearing); Doe v. Univ. of the South, 687 F. Supp. 2d at 752 (both complainant and respondent are entitled to select a hearing advisor, and may consult with their parents and/or attorneys in preparing their respective written statements setting forth facts in support of their respective positions); Mallory v. Ohio Univ., 76 Fed. Appx. at 637 (Mallory's attorney was allowed to attend disciplinary proceeding).

Third, John also alleges that under the circumstances the CJC Panel's application of the "preponderance of the evidence" standard violated due process principles. Because the evidence at the hearing almost exclusively consisted of each party's "she said, he said" testimony, with no physical, medical or corroborating evidence, and because the College was under scrutiny from the media and Department of Education with respect to its handling of previous sexual misconduct proceedings, this low evidentiary standard unfairly skewed the proceedings and resulted in a virtually pre-determined finding in favor of Jane. (Compl. ¶ 15e.). The College effectively requires the accused to bear the burden of proving innocence, rather than placing the burden on the accuser to prove guilt. (Id. ¶ 144).

Swarthmore defends its inadequate procedural safeguards by arguing that its procedures "are either expressly recommended or compelled by the Department of Education," pointing to the Office of Civil Rights' "Dear Colleague" Letter. (Def.'s Mem. at 29-30 & Exhibit B, attached thereto). But, the "Dear Colleague" Letter expressly states the DOE has determined the Letter is a "significant guidance document." (Ex. B at 1 n.1). Therefore, although the Letter offers "significant guidance," by its own terms it does not have the full force of law and is not binding on Swarthmore. Legal commentators have noted the "Dear Colleague" Letter has no binding legal authority because the Office of Civil Rights (OCR) did not employ the notice-and-comment rulemaking procedure in promulgating the Letter. (See Stephen Henrick, "A Hostile Environment For Student Defendants: Title IX And Sexual Assault On College Campuses, 40 N. Ky. L. Rev. 49, 60 & nn. 51-52 (2013) (citing articles)). Further, in the OCR's Revised Sexual Harassment Guidance issued in 2001, which the "Dear Colleague" Letter references, the OCR expressly states that "[p]rocedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and

supportable decisions."[10]  Swarthmore's inadequate safeguards simply do not, and in John's case did not, ensure "due process to both parties involved."

### C.    John Sufficiently Alleges Swarthmore Breached Its Contractual Obligations.

Swarthmore concedes (as it must) that the Student Handbook and College Bulletin constitute binding, enforceable contracts.  (See Def.'s Mem. at 13-14, citing Pennsylvania appellate court cases holding that a college's published policies and procedures in the Student Handbook constitute an "agreement between the parties").  Swarthmore argues, however, that John fails to allege that Swarthmore breached any contractual provision.  To the contrary, the complaint identifies specific provisions in the College's Student Handbook setting forth the College's obligations and the student's rights in sexual misconduct proceedings, and alleges specific facts showing that Swarthmore failed to comply with those provisions in John's case, causing him to suffer severe harm.  John has met his burden to state a breach of contract claim.[11]

### 1.    Standards Governing Breach Of Contract Claims.

At the outset, Swarthmore misstates the standards governing the breach of contract claims in this case.  Swarthmore claims that in order to state a claim John must show a "material" breach of the College's policies and procedures, which requires John to show how the breaches "might have affected the outcome" of the proceedings.  (Def.'s Mem. at 1, 13-16).

---

[10]    See 2001 Guidance at 22, available on the Department's website at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

[11]    See Wells v. Xavier Univ., 2014 WL 972172, at *2 (court denied college's motion to dismiss libel and Title IX claims, and noted the college denies the breach of contract and negligence claims but intends "to attack those claims when procedurally appropriate"); Dempsey v. Bucknell Univ., 2012 WL 1569826, at *20 (M.D. Pa. May 3, 2012) (holding student alleged sufficient facts to support claim that Bucknell breached the Student Handbook by failing to turn over some of the information plaintiff had requested; denying motion to dismiss claim); Williams v. Franklin & Marshall College, 2000 WL 62316, at *2 (denying college's motion to dismiss student's breach of contract claim alleging college violated its own regulations); Fellheimer v. Middlebury College, 869 F. Supp. 238, 245-47 (D. Vt. 1994) (granting partial summary judgment in student's favor, finding college breached contractual obligation to provide sufficient notice that student had been charged with "disrespect of persons" as well as rape).

Swarthmore is incorrect.

Courts in Pennsylvania long have held that "a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" <u>Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 225 (3d Cir. 2003), quoting <u>CoreStates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. 1999). "[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, ***a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract***." <u>Swartley v. Hoffner</u>, 734 A.2d 915, 919 (Pa. Super. 1999) (Emphasis added). Pennsylvania courts "***review the agreement between the parties concerning disciplinary procedures***[] contained within a portion of the student handbook . . . ***as we would any other agreement*** between two private parties." <u>Reardon v. Allegheny College</u>, 926 A.2d 477, 480 (Pa. Super. 2007), citing <u>Murphy v. Duquesne Univ. of the Holy Ghost</u>, 565 Pa. 571, 588-89, 777 A.2d 418, 428-29 (2001) (Emphasis added). "The general rule . . . has been that where a private university or college establishes procedures for the suspension or expulsion of its students, ***substantial compliance with those established procedures must be had before a student can be suspended or expelled***." <u>Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.</u>, 392 Pa. Super. 502, 510, 573 A.2d 575, 579 (1990) (Emphasis added). Nowhere in these cases is there any mention of a special requirement uniquely imposed on students at private universities to establish a "material" breach and state how that "might have affected the outcome."[12] In any

---

[12]    To support its contention that John must establish at the pleading stage a "material" breach, Swarthmore cites five cases that are completely inapposite. (<u>See</u> Def.'s Mem. at15, citing <u>Sabatini v. Its Amore Corp.</u>, <u>First Mortg. Co. of Pa. v. Carter</u>, <u>Fort Washington Res., Inc. v. Tannen</u>, <u>Norfolk S. Ry. Co. v. Basell USA Inc.</u>, and <u>Int'l Diamond Imp. Ltd. v. Singularity Clark, LP</u>). These cases address the issue (not present here) whether a party to a contract may unilaterally rescind or terminate the contract for non-performance by the alleged breaching party. The cases recite the well-established rule under

event, as shown below, John has alleged how each breach might have affected the outcome.

Several other black-letter rules govern this Court's determination of the sufficiency of the pleading of the contract claims in this case. In interpreting a contract "the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." <u>Southwestern Energy Production Co. v. Forest Resources, LLC</u>, 83 A.3d 177, 187 (Pa. Super. 2013). When construing agreements involving clear and unambiguous terms, the court "need only examine the writing itself to give effect to the parties' understanding." <u>Id.</u>; <u>see also</u> <u>Stamerro v. Stamerro</u>, 889 A.2d 1251, 1258 (Pa. Super. 2005) (the court "looks to what [the parties] have clearly expressed, for the law does not assume that the language was chosen carelessly"). "Thus, where the language is clear, there is no need for interpretation, and words cannot be added." <u>Int'l Systems, Inc. v. Personnel Data Systems, Inc.</u>, 274 Pa. Super. 500, 503, 418 A.2d 518, 519 (1980). As the Pennsylvania Supreme Court long ago observed, when the language is clear "we cannot add the words to it which it would be necessary to add to make it read as defendant would have it understood." <u>B.F. Goodrich Co. v. Wilson</u>, 337 Pa. 333, 340, 10 A.2d 422, 424 (1940).

"[T]he terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense." <u>Profit Wize Marketing v. Wiest</u>, 812 A.2d 1270, 1275 (Pa. Super. 2002). Language is ambiguous if it is "obscure in meaning through indefiniteness of expression or has a double meaning." <u>Id</u>. "Where the language of a contract is ambiguous, the provision is to be construed against the

---

Pennsylvania law that the party seeking rescission must show the non-performance was material, and conversely the breaching party can avert termination by showing that it substantially performed the contract. <u>See, e.g.</u>, <u>Int'l Diamond Imp. Ltd. v. Singularity Clark, LP</u>, 40 A.3d 1261, 1270-71 (Pa. Super. 2012) (focusing on "Pennsylvania's extensive body of caselaw addressing when a breach is sufficiently material to entitle the non-breaching party to cease performance"). Moreover, like all of the other cited cases, <u>Int'l Diamond</u> stresses that "inquiries into the materiality of a given breach [are] fact questions" for the jury. <u>Id</u>. at 1272.

drafter." Id.; see also Lane v. Com., 954 A.2d 615, 619 (Pa. Super. 2008) ("any contractual ambiguities are construed against the drafter of the provision").

Additionally, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Stamerro, 889 A.2d at 1259. The duty of good faith has been defined as "[h]onesty in fact in the conduct or transaction concerned." Id. "[I]t is possible to recognize certain strains of bad faith which include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Id. The implied covenant of good faith and fair dealing is a "principle[ ] for courts to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract." Id. With respect to a college's conduct in disciplinary proceedings involving sexual misconduct, the Pennsylvania Superior Court has succinctly stated: "It cannot be denied that college officials must protect the student body as well as assure that students charged with wrong-doing obtain fair treatment." Schulman v. Franklin & Marshall College, 371 Pa. Super. 345, 352, 538 A.2d 49, 52 (1988).

> ## 2. Swarthmore's Breaches.
>
> ### (a) Swarthmore Breached Its Contractual Obligation To Conclude Its Investigation Within The Mandated 60-Day Period.

Swarthmore breached its contractual obligation to conclude its investigation within the mandated 60-day period. (Compl. ¶¶ 13a., 34: "*In no case will an investigation last longer than 60 days*.") (Emphasis added). The College concluded its investigation on January 28, 2013 – 60 days after it opened the case – without charging John with any wrongdoing, but re-opened the investigation five months later on May 7, 2013. (Id. ¶¶ 95, 98). Swarthmore argues it did not re-open the investigation in May; instead, "a disciplinary proceeding was initiated in May"

because "that was when **_Jane Doe_** first requested a disciplinary hearing," and "there is no time limit in the policy on when a victim like Jane Doe may initiate such a proceeding." (Def.'s Mem. at 2, 17) (Emphasis in original). These arguments are without merit for multiple reasons.

First, Swarthmore's contention is improper because it argues with facts alleged in the complaint. On a motion to dismiss, Swarthmore must accept as true the factual allegations in the complaint; it cannot attempt to counter those facts by introducing its own purported "facts."

Second, Swarthmore admits that "some additional interviews and investigation was conducted to prepare for the actual disciplinary hearing in May 2013," but then illogically contends that the additional investigation "does not change the fact that the Title IX investigation was completed within 60 days." (Def.'s Mem. at 17 n.6). Swarthmore appears to argue that there were two investigations – the 60-day "Title IX" investigation," followed by a separate "disciplinary hearing" investigation to prepare for the Title IX hearing. But, the Student Handbook makes clear that there is to be **_one_** investigation – which may or may not lead to a disciplinary hearing – and "in no case" will that investigation "last longer than 60 days."

Third, Swarthmore is wrong about what the Student Handbook says concerning the initiation of disciplinary proceedings. The Student Handbook makes clear that such proceedings may be initiated in one of three ways: a written complaint filed by the complaining individual, or at the discretion of the deans, a written incident report from the Department of Public Safety, or a written report from the Title IX Coordinator, may substitute for a written complaint by a complainant. (See Compl,. Ex. A at 36). The Student Handbook also accords the deans the discretion to determine whether a major infraction, including an allegation of sexual misconduct, should be heard in a disciplinary proceeding before the College Judiciary Committee. (Id.). Additionally, in exceptional circumstances, the Associate Dean may move forward with judicial

proceedings even if a complaint has been withdrawn or is absent.  (Id.).

Fourth, Swarthmore argues that John identifies "no prejudice" caused by the re-opened investigation.  (Def.'s Mem at 17).  To the contrary, the complaint alleges that the College did far more than honor Jane Doe's request for a hearing.  As noted, Swarthmore permitted Jane to submit a new story about what had happened, which escalated the vague, equivocal allegations in the first investigation into outright allegations of forced oral sex in the re-opened investigation.  (Compl. ¶¶ 111-118).  The College also permitted Jane to submit to the hearing Panel the written statements of two of Jane's student-acquaintances concerning their interactions with Jane after the alleged assault.  (Id. ¶¶ 2, 118).  Because these witnesses were not present at the hearing, and the hearing was held during summer break after students had left the campus, John did not have the opportunity to question them either at the hearing or in advance of the hearing as part of preparing his defenses.[13]

Fifth, Swarthmore argues that John alleges no prejudice caused by the lapse of five months between the time the investigation concluded and when it was re-opened.  (Def.'s Mem. at 17).  To the contrary, the complaint alleges that the passage of five months compounded the prejudice to John that had already been caused by the lapse of 19 months between the alleged incident and Jane's first complaint.  The passage of nearly two years before John's hearing inevitably resulted in fragmented memories, inability to track down potential witnesses concerning such issues as Jane's level of intoxication on the night in question and her troubled relationship with her boyfriend, and the loss of text messages – all of which impaired John's ability to mount a full defense.  (Compl. ¶ 120).

---

[13]   The College also permitted Jane to introduce the live testimony of a third student-acquaintance concerning his interactions with Jane after the alleged incident.  (Compl. ¶¶ 2, 118).

**(b)** **Swarthmore Breached Its Contractual Obligation To Conduct The Hearing When Classes Are In Session And Not During College Breaks.**

Swarthmore breached its contractual obligation to hold John's hearing "when classes are in session and not during college breaks." (Compl. ¶¶ 13c., 131). Swarthmore counters that "graduation" was held on June 2, 2013, and thus, "summer break" had not begun before the May 30th hearing. (Def.'s Mem at 18). Swarthmore is wrong. The Student Handbook does not state that hearings will be held "before graduation"; it says hearings will be held "when classes are in session." The College Bulletin calendar for the Spring 2013 Semester states "Classes and seminars end" on May 3, 2013, and "Course examinations end" on May 18, 2013. (See Compl., Ex. B at iv). John's hearing was held on May 30, 2013, almost one month after classes ended and approximately two weeks after the course examination period ended. Neither John nor Jane was living on campus at the time of the hearing. (Compl. ¶¶ 100-106). There is a compelling reason why the College holds disciplinary hearings "when classes are in session." The College needs to give students charged with disciplinary violations the opportunity to contact peers, faculty, or administrators as witnesses. Although the Student Handbook gives the dean discretion to schedule the hearing "when classes resume" or for "more immediate adjudication," under the circumstances of this case – the lapse of two years from the date of the alleged incident, the complainant's changing stories, and the unavailability of witnesses on a cleared-out campus – and given the severity of the charge, the dean's decision to schedule the hearing during the college break was unjustified and not in good faith. (Id. ¶ 131).

**(c)** **Swarthmore Breached Its Contractual Obligation To Disclose The Evidence To Be Used Against John At The Hearing.**

Swarthmore breached its contractual obligation to disclose all of the evidence that would be presented at the hearing. (Compl. ¶¶ 13g., 124-125, 133). The Student Handbook

unequivocally states that "[b]oth the accused and the complainant(s) ***shall be shown a copy of the materials that will be present in the hearing*** in sufficient time before the hearing . . . to prepare their cases." (Id. ¶ 124) (Emphasis added). Contrary to this policy, John was not provided pre-hearing access to a written statement in an email prepared by Jane purporting to rebut a statement made by John in the course of the College's investigations. (Id. ¶ 125). Jane's statement was not included in the evidence file that John had been permitted to review in advance of the hearing, and thus, Swarthmore should not have allowed the statement to be used at the hearing. (Id. ¶¶ 124-125). The Panel not only allowed Jane to testify about the statement; on its own, it called the Title IX Coordinator to read portions of it into evidence. (Id. ¶ 134). Because John had not seen the statement before, he had no ability to respond to it in writing prior to the hearing, and was disadvantaged by learning about it for the first time at the hearing.

Swarthmore argues it did not breach the Student Handbook because the physical document itself was not admitted into evidence; rather, there was merely "testimony" about it. (Def.'s Mem. at 22). That argument is specious. The testimony effectively admitted the substance of the statement into evidence. Swarthmore also argues the complaint does not allege how the undisclosed evidence prejudiced John. (Id.). But, how could it not have been prejudicial? The Panel apparently felt the statement was significant enough to call the Title IX Coordinator as its own witness to testify about the statement. John should be permitted to proceed in discovery to determine why the Panel did so and to what extent the testimony effected its deliberations.

### (d)   Swarthmore Breached Its Contractual Obligation By Permitting An Undisclosed Witness To Testify At The Hearing.

With respect to disclosure of witnesses to be called at the hearing, the Student Handbook provides that "***the accused student and the complainant must submit to the Observer a list of***

***witnesses they plan to call at the hearing*** . . . .” (Compl. ¶ 46) (Emphasis added). Swarthmore breached this provision when the Panel, on its own, called an unscheduled witness, the College's Title IX Coordinator, to testify about Jane's undisclosed statement. (Compl. ¶¶ 13.h, 134-137). Swarthmore argues that “there is no prohibition on the panel calling its own witnesses.” (Def.'s Mem. at 22). In other words, although Swarthmore ***admits*** that the Student Handbook does not expressly authorize the Panel to call its own witnesses, it nevertheless argues that its failure to manifest that intention in the contract ***it wrote*** is of no consequence – the Panel can do as it wishes in the absence of an express prohibition otherwise. Put another way, Swarthmore argues that its failure to expressly authorize the Panel's action, *and* its failure to expressly prohibit its action, equates to “the Panel can do as it pleases.” This interpretation cannot be reconciled with the rule of contract construction requiring a court to “give effect to the intent of the parties as reasonably manifested by the language of their written agreement.” Southwestern Energy Production, 83 A.3d at 187. When construing contracts that are clear and unambiguous, the court “looks to what [the parties] have clearly expressed, for the law does not assume that the language was chosen carelessly.” Stamerro, 889 A.2d at 1258.

Here, the language of the Handbook clearly authorizes the ***parties*** to call the witnesses they have listed, and authorizes the parties and the Panel to ***question*** the witnesses.[14] It does not authorize the Panel to call its own witnesses. Swarthmore impermissibly attempts to “add … words” to the contract “to make it read as [Swarthmore] would have it understood.” B. F. Goodrich, 337 Pa. at 340, 10 A.2d at 424. As the drafter of the contract, Swarthmore could have stated that Panel members have discretionary authority to call their own, undisclosed witnesses.

---

[14]     With respect to questioning witnesses at the hearing, the Student Handbook provides that “both parties are questioned by the Panel,” after which “[w]itnesses are then called, one by one, and either party involved shall have the opportunity to question any witnesses after the Panel members have asked their questions of the witnesses.” (Compl., Ex. A at 39).

It did not do so. To the extent the language is ambiguous, the provision is construed against Swarthmore as the drafter of the contract. Profit Wize, 812 A.2d at 1275. Further, John reasonably expected that the witnesses against him were those witnesses that had been disclosed before the hearing, and Swarthmore had expressly represented to him that the Title IX Coordinator would not be present at the hearing. Permitting her testimony in these circumstances violated Swarthmore's duty of good faith and fair dealing.

**(e)      Swarthmore Breached Its Contractual Obligation To Provide John With Adequate Advice From An Impartial Observer.**

The Student Handbook provides that an Observer, whose role is to assure "impartiality in the proceedings, "will meet separately with both the complainants(s) and the accused to explain the procedures and give all a chance to ask questions about the judicial process." (Compl. ¶ 40). The Student Handbook grants the accused the right "to be made aware of the options available." (Id. ¶ 122). Implicit in this right is Swarthmore's affirmative obligation to inform the accused of "the options available."

Swarthmore breached these contractual obligations in three ways. First, John was not informed by Swarthmore of his right to submit and introduce into evidence his written response to Jane's written statements and the Title IX Coordinator's report. (Id. ¶¶ 13d. & f., 35-36, 121, 122). As a result, the Panel had before it Jane's written statements and the Title IX Coordinator's report but no written statement from John responding to them. (Id.).

Second, the College assigned to John a "neutral" Observer, but during the duration of the re-opened investigation he was advised by Associate Dean Westphal, who was the administrator who selected the charges against him. (Id. ¶ 129). Associate Dean Westphal advised John that no student had been expelled for sexual misconduct in her 25 years at Swarthmore, which gave John a false impression that it was unlikely he would be subjected to the most severe penalty.

32

(Id. ¶ 130).

Third, as noted in the section of this brief on due process, it appears the College is now arguing that a provision in the Student Handbook permits the parties involved in disciplinary proceedings to obtain the advice of an attorney. As noted, that provision appears in the section of the Student Handbook dealing with the College's strict code of confidentiality with respect to disciplinary proceedings; the provision does not use the words "attorney" or "counsel" or "legal advice" or "advice of counsel," or any other explicit words signifying that the accused has a right to an attorney for any part of the proceedings, including leading up to the hearing. In any event, Associate Dean Westphal never informed John he had a right to legal counsel. In fact, in the Charge Letters she sent to John, attached as Exhibits D and E to Swarthmore's memorandum (if the Court considers them), she "reminds" John that "*all CJC proceedings are confidential and should not be shared with the general public, except your family, therapist … and/or support person for the hearing*." (Def.'s Mem., Exs. D & E) (Emphasis added). Thus, it appears that Swarthmore not only failed to inform John of "the options available," but misled John into believing that an attorney was *not* an option. The College breached its duty of good faith and fair dealing: its actions can fairly be characterized as bad faith in that it evaded the spirit of the bargain and abused its power to specify the terms of the contract. Stamerro, 889 A.2d at 1259.

### (f) Swarthmore Breached Its Contractual Obligation To Timely Notify John Of The Actual Charges Against Him.

Swarthmore breached its contractual obligations to timely notify John of the actual charges against him by changing the charge of "harassment by communication" to "sexual harassment" in the Formal Charge Letter sent to John less than two days before the hearing. (Compl. ¶¶ 13b., 44, 126-128). With respect to informing the accused of the charges against him, the Student Handbook states that "[t]he student charged shall meet with the Observer and be

informed of the charge(s) and directed to a copy of the student judicial procedures generally three days in advance. The formal charge letter shall be presented in writing including the names of the appointed panel, the time, date, and location of the hearing typically 24 hours in advance of the hearing." (Id. ¶ 44). Swarthmore initially provided John with the charges on May 14, 2013. On May 22, 2013, Associate Dean Westphal assured John the charges had not been changed. Six days later, on May 28, 2013 at 2 p.m., John received a Formal Charge Letter that replaced the previously-noticed "harassment through communication" with the charge of "sexual harassment." (Id. ¶ 126). Thus, instead of providing John with the customary three days notice of the charges against him, it allowed him less than two days to prepare for the new and more serious charge of "sexual harassment." (Id. ¶ 127).

Swarthmore argues that it complied with its "notice" obligation by providing John with the Formal Charge Letter 24 hours in advance of the hearing (Def.'s Mem. at 17-18), but it does not (and cannot) argue that there is any provision in the Student Handbook permitting it to change the charges in the interim between notice of the "relevant charges" and presentation of the Formal Charge Letter. (Compl. ¶ 127). The "notice" language in the Student Handbook states only that the Formal Charge Letter will include names of the panel, and the time, date, and location of the hearing, not that it will include "any new charges." Yet again, Swarthmore impermissibly seeks to "add … words" to the contract "to make it read as [Swarthmore] would have it understood." B.F. Goodrich, 377 Pa. at 340, 10 A.2d at 424.

Swarthmore also argues that the new charge was merely a "change in wording," that it did not involve "new or different conduct," and that John does not allege how the change could have affected the outcome of the hearing. (Def.'s Mem. at 18). If Swarthmore believes that "harassment through communication" involves the same conduct as "sexual harassment," it need

not have changed the charge.  As for affecting the outcome, the sexual harassment charge

coupled with sexual assault clearly involves a greater level of culpability.  John is entitled to take

discovery to determine the extent to which this charge effected the Panel's deliberations.

### (g)     Swarthmore Breached Its Contractual Obligation To Ensure That Jane Doe Was Present At The Hearing.

As previously noted in the "erroneous outcome" section of this brief, the hearing Panel in

John's case interrupted John during a critical part of his testimony concerning his encounters

with Jane and suggested to Jane that she might wish to leave the hearing.  She did so.  (Compl.

¶¶ 139-141).  This extraordinary intervention by the Panel during the course of the proceedings

breached Swarthmore's obligation to ensure that Jane Doe was present at the hearing.  (Id. ¶

13i.).  As noted, the Student Handbook states that "[n]ormally, "*all evidence presented at a*

*hearing* by either party *shall be introduced in the presence of the other party*."  (Id. ¶ 45)

(Emphasis added).  Swarthmore argues that the Handbook provides a "right" for each party to be

present during the hearing but "it creates no such obligation."  (Def.'s Mem. at 23).  That is not

what the Handbook says.  The language is broad and mandatory – *all evidence* . . . *shall* be

introduced in the *presence of the other party*.  Although the Handbook leaves some room for

deviation from the rule by using the term "normally," a fair reading of that word in context is

that it is intended to be an accommodation to a party in situations that may arise during the

hearing where the party is not able to attend some part of it.  Swarthmore contends John could

not conceivably have been prejudiced by Jane's removal from the hearing.  But, how could an

accused not be prejudiced when the Panel adjudicating his case, on its own, encourages his

accuser to leave the hearing apparently to spare her from having to hear his testimony about what

had happened?  The strong suggestion of bias is prejudicial in itself.

### (h) Swarthmore Breached Its Contractual Obligation To Ensure That The Panel Did Not Consider Evidence Of John's Past Sexual History.

The Student Handbook unequivocally precludes the Panel from considering evidence of the accused's or the complainant's prior sexual conduct: "[t]he complainant(s) and the accused *shall have … the right … to have past sexual history excluded from the hearing process*." (Compl. ¶ 49) (Emphasis added).  Swarthmore breached its contractual obligation by failing to exclude from evidence references to John's alleged sexual history.  Instead of enforcing this fundamental procedural safeguard, the Panel permitted Jane to testify concerning statements John allegedly made to her about his previous sexual encounters.  (Id. ¶ 138).  Swarthmore argues that John's statements were at issue in Jane Doe's sexual harassment charge and were also "relevant" to show her "state of mind" and "explain her conduct" during the alleged assault. (Def.'s Mem. at 23).  The College argues its obligation to exclude such evidence applies only when it is being "offered to show promiscuity," not when it is relevant as the basis of the charge. (Id.).  Here again, Swarthmore adds language to the contract that does not exist.  Nowhere does the Handbook state that past sexual history is fair game when it helps to establish an alleged victim's "state of mind," or when the complainant's accusation involves the accused's past sexual history.  The language is absolute and mandatory – both parties "shall have the right" to exclude such evidence from the hearing.  As the drafter of the contract, Swarthmore could have included qualifying or limiting language, but it did not do so.  It is bound by the language it chose.

### D. John Sufficiently Alleges A Claim For Negligent Infliction Of Emotional Distress.

Pennsylvania allows recovery for negligent infliction of emotional distress in four factual scenarios:  "(1) situations where the defendant had a contractual or fiduciary duty toward the

plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative." Weiley v. Albert Einstein Med. Center, 51 A.3d 202, 217 (Pa. Super. 2012), citing Toney v. Chester Cnty. Hosp., 961 A.2d 192, 197-98 (Pa. Super. 2008), aff'd by equally divided court, 614 Pa. 98, 36 A.3d 83 (2011).[15] As to the first theory, "[t]he crux of a negligent infliction of emotional distress claim is that [defendants] breached some duty they owed to [plaintiff] and that the breach injured her." 51 A.3d at 217.

Under this theory of recovery, "a plaintiff must establish the elements of a negligence claim, *i.e.*, that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." Weiley, 51 A.3d at 217 (citation omitted). This claim is limited to "preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of a breach . . . ." Id. at 218. In other words, there must exist a "special relationship" between the plaintiff and defendant that "encompass[es] an implied duty to care for the plaintiff's emotional well-being. Id.

In addition, the plaintiff "must demonstrate that [he] is a foreseeable plaintiff and that [he] suffered a physical injury as a result of the defendant's negligence." Toney, 961 A.2d at 199. Foreseeability means that "under the circumstances as alleged, [plaintiff] would suffer traumatic emotional distress . . . ." Id. As for physical injury, "symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and . . . ongoing mental, physical and emotional harm sufficiently state physical manifestations of emotional suffering to

---

[15]     Although the Pennsylvania Supreme Court's opinion in Toney, supra, does not have precedential value (because the opinion was evenly divided at 3-3), the Superior Court in Weiley found that "it has persuasive value." Weiley, 51 A.3d at 217 n.16. The Superior Court's decision in Toney has precedential effect. Id.

sustain a cause of action." Id. at 200 (citations omitted).

Swarthmore argues that John has not stated a claim for negligent infliction of emotional distress because the claim is barred by the gist of the action doctrine and John has not alleged physical injury. (Def.'s Mem. at 32). Swarthmore has overlooked the development in the law of negligent infliction of emotional distress announced in the Toney and Weiley decisions cited above. The Pennsylvania Superior Court clearly has held that a negligent infliction of emotional distress claim can arise from a contractual duty, i.e., it can co-exist with a contract claim. And, John does allege physical harm. (Compl. ¶ 210: "Swarthmore acted in a negligent manner and, as a direct result of such conduct, John suffered and will continue to suffer, *inter alia*, mental anguish, severe emotional distress, physical harm, financial loss, and humiliation . . . ."). The factual allegations of the complaint sufficiently demonstrate that Swarthmore was negligent in its handling of the sexual misconduct proceedings in John's case, and that John was a foreseeable plaintiff – i.e., it was foreseeable that Swarthmore's mishandling of the proceedings and its imposition of the most severe penalty, immediate expulsion carrying with it a permanent mark on his academic record that he had been expelled from Swarthmore on a finding of sexual assault, would cause John to suffer severe emotional distress.

The complaint also alleges facts sufficient to establish that the College had a fiduciary relationship with John. Although traditional fiduciary relationships exist between "trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent," Pennsylvania courts hold that where these relationships do not exist "confidential relations may still arise based on the facts and circumstances apparent on the record." Weiley, 51 A.3d at 218. "The essence of [a confidential] relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust . . . on the other side." Id. Accordingly, a fiduciary relationship

appears "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." Id. "[T]he party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealing with the other and refrain from using his position to the other's detriment and his own advantage." Id. (citations omitted).

Here, the College had a responsibility to John to assure that its adjudication of such a sensitive and personal matter was "fair and equitable" to both parties, and that the College's policies and procedures and due process safeguards were scrupulously followed and were commensurate with the seriousness of the charge and the severity of the possible penalties. The College had an overmastering influence over John's college career and his future life, and John justifiably reposed his trust with Swarthmore that it would handle his case with "scrupulous fairness and good faith." The complaint alleges facts showing Swarthmore breached that trust. See Carrington v. Duke Univ., No. 1:08-cv-00119, Memorandum Op. at 75-80 (M.D.N.C. Mar. 31, 2011) (holding that Duke and its President, Vice President, and Dean created a fiduciary relationship with members of Duke's lacrosse team accused of rape because the administrators gave the players advice regarding how to handle a pending criminal investigation and the players reposed trust in them, which the administrators abused).[16]

**E.      Swarthmore Has Conceded A Binding Contract Between The Parties Exists, And Thus, The Alternative Claims For Negligence And Promissory Estoppel Are Moot.**

The complaint alleges claims for promissory estoppel and negligence in the alternative to the contract claim in the event that Swarthmore were to argue or this Court were to find that no valid contract exists. (Compl. ¶¶ 193-194, 201-202). Swarthmore has conceded the Student

---

[16]      If the Court finds that the allegations in the negligent infliction count (Count VI) do not sufficiently set forth the basis for the claim, John requests that the Court permit him to amend the complaint to correct any such deficiencies.

Handbook and College Bulletin are binding contracts between the parties. (Def.'s Mem. at 31).

Accordingly, unless this Court were to rule otherwise, these alternative claims are moot.

## IV. CONCLUSION

For all the foregoing reasons, John Doe respectfully requests that this Court deny

Swarthmore's Motion to Dismiss in its entirety.


Respectfully submitted,


/s/  Patricia M. Hamill
Patricia M. Hamill (I.D. No. 48416)
Jeannette M. Brian (I.D. No. 66169)
Conrad O'Brien PC
1500 Market Street, Centre Square
Suite 3900, West Tower
Philadelphia, PA  19102-2100
(215) 864-9600

*Attorneys for Plaintiff*

April 21, 2014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Plaintiff's Memorandum Of Law In Opposition To Defendant Swarthmore College's Motion To Dismiss The Complaint was served on the date below by electronic filing on this Court's ECF system and in accordance with the parties' agreement, by email upon:

Michael E. Baughman, Esquire
Kaitlin M. Gurney, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799

*Attorneys for Defendant*
*Swarthmore College*


/s/ Patricia M. Hamill
Patricia M. Hamill


April 21, 2014